# AUTOMILE INC.

## AMENDED AND RESTATED
## RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT

This Amended and Restated Right of First Refusal and Co-Sale Agreement (this "Agreement") is made and entered into as of October 10, 2017 by and among Automile Inc., a Delaware corporation (the "Company"), Jens Nylander, Jacob Pontén and Felix Rosén (together with any entities controlled by such individuals, the "Founders"), the holders of the Company's Common Stock ("Common Stock") listed on Schedule 1 (the "Common Holders," and collectively with the Founders, the "Key Holders"), the holders of outstanding Preferred Stock of the Company ("Preferred Stock") listed on Schedule 2 hereto (the "Existing Preferred Holders") and the purchasers of Series B Preferred Stock of the Company listed on Schedule 3 (the "New Investors" and, together with the Existing Preferred Holders, the "Investors" and, together with the Key Holders, the "Stockholders").

## RECITALS

The Company, the Key Holders and the Existing Preferred Holders are parties to an Amended and Restated Right of First Refusal and Co-Sale Agreement dated as of December 5, 2016 (the "Prior Agreement").

The Company and the New Investors have entered into a Series B Preferred Stock Purchase Agreement (the "Purchase Agreement") of even date herewith, pursuant to which the Company desires to sell to the New Investors and the New Investors desire to purchase from the Company shares of the Company's Series B Preferred Stock (the "Series B Preferred Stock"). A condition to the New Investors' obligations under the Purchase Agreement is that the Company, the Founders, the Existing Preferred Holders and the New Investors enter into this Agreement in order to provide the Investors the opportunity to purchase and/or participate, upon the terms and conditions set forth in this Agreement, in subsequent sales by the Key Holders of shares of the Company's common stock (the "Key Holders' Shares"). The Company and the Key Holders desire to facilitate the voting arrangements set forth in this Agreement and to induce the Investors to purchase shares of Series B Preferred Stock pursuant to the Purchase Agreement by agreeing to the terms and conditions set forth below.

The Company, the Key Holders and the Existing Preferred Holders desire to amend and restate the Prior Agreement in its entirety as set forth herein.

## AGREEMENT

The parties agree as follows:

A.    **Amendment of Prior Agreement.**

Pursuant to Section 9.3 of the Prior Agreement, effective and contingent upon execution of this Agreement by the Company, the requisite majority of the Key Holders' shares and the holders of at least a majority of the Company's Series A-1 Preferred Stock, voting as a series and

60% of the Company's Series A-2 Preferred Stock Preferred Stock and Series A-3 Preferred Stock, voting together as a single class on an as-converted basis, the Prior Agreement is hereby amended and restated in its entirety to read as set forth in this Agreement, and the Company, the Founders, the Existing Preferred Holders and the New Investors shall be bound by the provisions hereof as the sole agreement of the Company, the Founders, the Existing Preferred Holders and the New Investors with respect to the subject matter hereof.

1.     **Sales by Key Holders.**

1.1     **Definitions.**

(a)     "Capital Stock" means (i) shares of Common Stock and Preferred Stock (whether now outstanding or hereafter issued in any context), (ii) shares of Common Stock issued or issuable upon conversion of Preferred Stock, and (iii) shares of Common Stock issued or issuable upon exercise or conversion, as applicable, of stock options, warrants or other convertible securities of the Company, in each case now owned or subsequently acquired by any Key Holder, any Investor, or their respective successors or permitted transferees or assigns. For purposes of the number of shares of Capital Stock held by an Investor or Key Holder (or any other calculation based thereon), all shares of Preferred Stock shall be deemed to have been converted into Common Stock at the then-applicable conversion ratio.

(b)     "Common Stock" means shares of Common Stock of the Company.

(c)     "Company Notice" means written notice from the Company notifying the selling Key Holders that the Company intends to exercise its Right of First Refusal as to some or all of the Transfer Stock with respect to any Proposed Key Holder Transfer.

(d)     "Investor Notice" means written notice from an Investor notifying the Company and the selling Key Holder that such Investor intends to exercise its Secondary Refusal Right as to a portion of the Transfer Stock with respect to any Proposed Key Holder Transfer.

(e)     "Proposed Key Holder Transfer" means any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Transfer Stock (or any interest therein) proposed by any of the Key Holders.

(f)     "Proposed Transfer Notice" means written notice from a Key Holder setting forth the terms and conditions of a Proposed Key Holder Transfer.

(g)     "Prospective Transferee" means any person to whom a Key Holder proposes to make a Proposed Key Holder Transfer.

(h)     "Right of First Refusal" means the right, but not an obligation, of the Company, or its permitted transferees or assigns, to purchase some or all of the Transfer Stock with respect to a Proposed Key Holder Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

(i)     "Secondary Notice" means written notice from the Company notifying the Investors and the selling Key Holder that the Company does not intend to exercise its Right of

First Refusal as to all shares of Transfer Stock with respect to any Proposed Key Holder Transfer.

(j)      "<u>Secondary Refusal Right</u>" means the right, but not an obligation, of each Investor to purchase up to its pro rata portion (based upon the total number of shares of Capital Stock then held by all Investors) of any Transfer Stock not purchased pursuant to the Right of First Refusal, on the terms and conditions specified in the Proposed Transfer Notice.

(k)      "<u>Transfer Stock</u>" means shares of Capital Stock owned by a Key Holder, or issued to a Key Holder after the date hereof (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or the like), but does not include any shares of Series Seed Preferred Stock or of Common Stock that are issued or issuable upon conversion of Series Seed Preferred Stock.

(l)      "<u>Undersubscription Notice</u>" means written notice from an Investor notifying the Company and the selling Key Holder that such Investor intends to exercise its option to purchase all or any portion of the Transfer Stock not purchased pursuant to the Right of First Refusal or the Secondary Refusal Right.

1.2   **Right of First Refusal.**

(a)      **Grant.**   Subject to the terms of Section 1.7 below, each Key Holder hereby unconditionally and irrevocably grants to the Company a Right of First Refusal to purchase all or any portion of Transfer Stock that such Key Holder may propose to transfer in a Proposed Key Holder Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

(b)      **Notice.**   Each Key Holder proposing to make a Proposed Key Holder Transfer must deliver a Proposed Transfer Notice to the Company and each Investor not later than forty-five (45) days prior to the consummation of such Proposed Key Holder Transfer. Such Proposed Transfer Notice shall contain the material terms and conditions (including price and form of consideration) of the Proposed Key Holder Transfer, the identity of the Prospective Transferee and the intended date of the Proposed Key Holder Transfer.  To exercise its Right of First Refusal under this Section 1.2, the Company must deliver a Company Notice to the selling Key Holder within fifteen (15) days after delivery of the Proposed Transfer Notice.  In the event of a conflict between this Agreement and any other agreement that may have been entered into by a Key Holder with the Company that contains a preexisting right of first refusal, the Company and the Key Holder acknowledge and agree that the terms of this Agreement shall control and the preexisting right of first refusal shall be deemed satisfied by compliance with Subsection 1.2(a) and this Subsection 1.2(b).

(c)      **Grant of Secondary Refusal Right to Investors.**   Subject to the terms of Section 1.7 below, each Key Holder hereby unconditionally and irrevocably grants to the Investors a Secondary Refusal Right to purchase all or any portion of the Transfer Stock not purchased by the Company pursuant to the Right of First Refusal, as provided in this Subsection 1.2(c).  If the Company does not intend to exercise its Right of First Refusal with respect to all Transfer Stock subject to a Proposed Key Holder Transfer, the Company must

deliver a Secondary Notice to the selling Key Holder and to each Investor to that effect no later than fifteen (15) days after the selling Key Holder delivers the Proposed Transfer Notice to the Company.  To exercise its Secondary Refusal Right, an Investor must deliver an Investor Notice to the selling Key Holder and the Company within ten (10) days after the Company's deadline for its delivery of the Secondary Notice as provided in the preceding sentence.

(d)     **Undersubscription of Transfer Stock.**  If options to purchase have been exercised by the Company and the Investors with respect to some but not all of the Transfer Stock by the end of the ten (10) day period specified in the last sentence of Subsection 1.2(c) (the "Investor Notice Period"), then the Company shall, immediately after the expiration of the Investor Notice Period, send written notice (the "Company Undersubscription Notice") to those Investors who fully exercised their Secondary Refusal Right within the Investor Notice Period (the "Exercising Investors").  Each Exercising Investor shall, subject to the provisions of this Subsection 1.2(d), have an additional option to purchase all or any part of the balance of any such remaining unsubscribed shares of Transfer Stock on the terms and conditions set forth in the Proposed Transfer Notice.  To exercise such option, an Exercising Investor must deliver an Undersubscription Notice to the selling Key Holder and the Company within ten (10) days after the expiration of the Investor Notice Period.  In the event there are two (2) or more such Exercising Investors that choose to exercise the last-mentioned option for a total number of remaining shares in excess of the number available, the remaining shares available for purchase under this Section 1.2(d) shall be allocated to such Exercising Investors pro rata based on the number of shares of Transfer Stock such Exercising Investors have elected to purchase pursuant to the Secondary Refusal Right (without giving effect to any shares of Transfer Stock that any such Exercising Investor has elected to purchase pursuant to the Company Undersubscription Notice).  If the options to purchase the remaining shares are exercised in full by the Exercising Investors, the Company shall immediately notify all of the Exercising Investors and the selling Key Holder of that fact.

(e)     **Consideration.**  The purchase price ("Purchase Price") for the Offered Shares purchased by the Investors or their permitted assignees under this Section 1.2 shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(f)     **Payment.**  Payment of the Purchase Price shall be made, at the option of the Investor or its permitted assignees, in cash by check or wire transfer within thirty (30) days after receipt of the Proposed Transfer Notice or in the manner and at the times set forth in the Proposed Transfer Notice.

1.3     **Co-Sale Right.**  To the extent that the Right of First Refusal is not exercised by the Company or the Investors, each Investor shall have the right (the "Co-Sale Right"), exercisable upon written notice to the Company within 15 business days after the expiration of the Right of First Refusal to participate in such Key Holder's sale of Offered Shares pursuant to the specified terms and conditions of such Purchase Offer (the "Co-Sale Notice").  To the extent an Investor exercises such Co-Sale Right in accordance with the terms and conditions set forth below, the number of Offered Shares which such Key Holder may sell pursuant to such Purchase

Offer shall be correspondingly reduced.  The Co-Sale Right of each Investor shall be subject to the following terms and conditions:

(a) **Calculation of Shares.**  Each Investor may sell all or any part of that number of shares of Common Stock of the Company issued or issuable upon conversion of Preferred Stock, or Common Stock received in connection with any stock dividend, stock split or other reclassification thereof (the "Conversion Shares") equal to the product obtained by multiplying (i) the aggregate number of Offered Shares not subscribed for pursuant to Section 1.1 by (ii) a fraction, the numerator of which is the number of Conversion Shares at the time owned by such Investor and the denominator of which is the sum of (A) the total number of Conversion Shares at the time owned by all Investors participating in such sale plus (B) the total number of Shares at the time owned by such Key Holder, including shares transferred by such Key Holder to Permitted Transferees (as defined below) in accordance with this Agreement.

(b) **Delivery of Certificates or Stock Power.**  Each Investor may effect its participation in the sale by delivering to the selling Key Holder for transfer to the prospective purchaser one or more certificates or a stock power, as applicable, properly endorsed for transfer, with respect to the Conversion Shares that such Investor elects to sell.

1.4 **Transfer.**  The stock certificate(s) or stock power that the Investor delivers to the selling Key Holder pursuant to Section 1.3 shall be delivered by such Key Holder to the prospective purchaser in consummation of the sale pursuant to the terms and conditions specified in the Notice, and such Key Holder shall promptly thereafter remit to such Investor that portion of the sale proceeds to which such Investor is entitled by reason of its participation in such sale. To the extent that any prospective purchaser or purchasers prohibits such assignment or otherwise refuses to purchase Conversion Shares from an Investor exercising its Co-Sale Right hereunder, the selling Key Holder or Key Holders shall not sell to such prospective purchaser or purchasers any Shares unless and until, simultaneously with such sale, the selling Key Holder or Key Holders shall purchase such Conversion Shares from such Investor for the same consideration and on the same terms and conditions as the proposed transfer described in the Notice (which terms and conditions shall be no less favorable than those governing the sale to the purchaser by the Key Holder or Key Holders ).

1.5 **Non-Exercise of Rights.**  To the extent that the Company and the Investors have not exercised in full their Secondary Refusal Right to purchase the Offered Shares, the selling Key Holder shall have a period of 60 days from the expiration of such rights in which to sell any unpurchased Offered Shares upon terms and conditions no more favorable than those specified in the Notice, to the third party transferee(s) identified in the notice; provided that any such sale or other transfer is effected in accordance with any applicable securities laws and the transferee identified in the notice agrees in writing that the provisions of Section 1 shall continue to apply to the Shares in the hands of such transferee.  The Company, in consultation with its legal counsel, may require the selling Key Holder to provide an opinion of counsel evidencing compliance with applicable securities laws.  In the event such selling Key Holder does not consummate the sale or disposition of the Offered Shares within the 60 day period commencing with the expiration of these rights, the Company's Right of First Refusal and the Investors' Secondary Refusal Right and Co-Sale Rights shall again become applicable to such sale or disposition or to any subsequent sale or disposition of Key Holders' Shares, and no such sale or

disposition may occur without the Key Holder first complying with the terms of Sections 1.1 and 1.3 above.

1.6    **No Adverse Effect.**  The exercise or non-exercise of the rights of the Investors hereunder to participate in one or more sales of Key Holders' Shares made by a Key Holder shall not adversely affect their rights to participate in subsequent sales of Key Holders' Shares by a Key Holder.

1.7    **Permitted Transactions.**  The provisions of Section 1 of this Agreement shall not pertain or apply to:

> (a)    any repurchase of Key Holders' Shares by the Company in transactions approved by the Board, including the Series B Director;

> (b)    any *bona fide* gift for no consideration;

> (c)    any sale or transfer to a Key Holder's Immediate Family or a trust for the benefit of the Key Holder or the Key Holder's Immediate Family ("Immediate Family" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships, or any person sharing the Key Holder's household (other than a tenant or an employee));

> (d)    any sale or transfer of Key Holders' Shares held by the Founders between or among one or more of the Founders (including entities controlled by the Founders);

> (e)    any sale or transfer by a Founder of up to 5% of the total number of Key Holders' Shares held by such Founder on the date of this Agreement in any twelve-month period; or

> (f)    any sale or transfer by the Key Holders in an aggregate amount equal to 1,699,001 shares to be completed within 60 days from the date of this Agreement.

*provided*, in each case, that (i) the transferring Key Holder shall inform each Investor who holds shares of equity securities of the Company with an aggregate liquidation preference of at least $1,000,000, as calculated based on the prices set forth in Article IV(B)2(a)-(b) of the Company's Third Amended and Restated Certificate of Incorporation (as amended from time to time), and (ii) the pledgee, transferee or donee (each a "Permitted Transferee") shall furnish such Investors with a written agreement to be bound by and comply with all provisions of this Agreement applicable to the transferring Key Holder; provided that the foregoing shall not apply to transfers pursuant to subsection (a) above.

1.8    **Assignment of Rights.**  The rights of the Investors set forth in this Section 1 may be assigned (but only with all related obligations) only to a transferee or assignee of at least ten percent (10%) of an Investor's Conversion Shares set forth on Schedule 2 or Schedule 3, as applicable (or all of such Investor's Conversion Shares if such Investor holds less than ten percent (10%) of such amount) provided that (a) the Company is, within a reasonable time after

such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such rights are being assigned, and (b) such transferee agrees in writing to be bound by the provisions of this Agreement, and (c) such transferee is not an actual or potential competitor of the Company, as determined in good faith by the Company's Board of Directors.  Notwithstanding the foregoing, any Investor may transfer its rights set forth in this Section 1 without regard to the minimum number of Conversion Shares described in the first sentence of this Section 1.8 if the transferee is a constituent partner or member of such Investor or an entity controlling, controlled by or under common control with such Investor.

2.      **Founder Matters.**

2.1      **Founder Vesting.**  Each Founder hereby agrees that 75% of such Founder's shares shall initially be subject to the terms and conditions of this Section 2 (such shares, the "Founder Shares").  At any time, any Founder Shares that remain subject to the restrictions set forth herein shall be deemed "Unvested Shares", and Founder Shares that have been released from such restrictions shall be deemed "Vested Shares."   All restrictions set forth in this Section 2 shall terminate with respect to 1/48th of the Founder Shares on each one (1) month anniversary of providing continuous service to the Company (or its subsidiary or parent companies) as an employee or consultant ("Service") following April 24, 2015, such that all Founder Shares shall become Vested Shares during the period of continuous Service ending April 24, 2019 (the "Vesting Period").  Any entity deemed a "Founder" under this Agreement that is not a natural person shall be deemed to be providing Service for the purposes of this Section 2 so long as the natural person who controls such entity is providing Service.

2.2      **Purchase Option.**  If, during the Vesting Period, a Founder's Service terminates for any reason, then the Investors or their permitted assignees shall have an option to purchase such Founder's Unvested Shares on the terms and conditions set forth in this Section 2.2 (the "Investor Option").

(a)      **Price.**  If the Founder's Service terminates for any reason other than a termination without Cause (as defined below), then the purchase price applicable to such Unvested Shares shall be the lower of the fair market value of such shares, as determined by the Company's Board of Directors (the "Board") in good faith, or the original purchase price for such shares.  If the Founder is terminated without Cause, then the purchase price applicable to such Unvested Shares shall be the fair market value of such shares.

"Cause" for termination will exist if the Founder is terminated for any of the following reasons:  (i) any material breach by Founder of any material written agreement between Founder and the Company and Founder's failure to cure such breach within 30 days after receiving written notice thereof; (ii) any failure by Founder to comply with the Company's material written policies or rules as they may be in effect from time to time; (iii) neglect or persistent unsatisfactory performance of Founder's duties and Founder's failure to cure such condition within 30 days after receiving written notice thereof; (iv) Founder's repeated failure to follow reasonable and lawful instructions from the Board or Chief Executive Officer and Founder's failure to cure such condition within 30 days after receiving written notice thereof; (v) Founder's conviction of, or plea of guilty or nolo contendre to, any crime that results in, or is reasonably

expected to result in, material harm to the business or reputation of the Company; (vi) Founder's commission of or participation in an act of fraud against the Company; (vii) Founder's intentional material damage to the Company's business, property or reputation; or (viii) Founder's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom the Founder owes an obligation of nondisclosure as a result of his or her relationship with the Company.  For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Founder's death or disability.  The determination as to whether a Founder has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on the Founder.  The foregoing definition does not in any way limit the Company's ability to terminate a Founder's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any subsidiary, parent, affiliate, or any successor thereto, if appropriate.

(b)     **Notice.**  The Company shall deliver to each Investor a written notice (the "Option Notice") stating the number of Unvested Shares subject to the Investor Option and the purchase price applicable to such Unvested Shares.

(c)     **Exercise of Investor Option.**  Each Investor shall have the right to submit, within 6 months after receipt of the Option Notice, notice of its irrevocable commitment to exercise such Investor Option on a pro rata basis, based upon the number of Conversion Shares held by such Investor relative to the aggregate number of Conversion Shares held by all Investors; *provided that* outstanding shares of Series Seed Preferred shall not be considered Conversion Shares for the purposes of this Section 2.2(c).  Each Investor that exercises the Investor Option shall effect the purchase of its pro rata share of the Unvested Shares, including payment of the purchase price, not more than 7 business days after submitting notice or its intent to exercise the Investor Option.  At such time, the Founder shall deliver to the exercising Investors a stock power properly endorsed for transfer.

3.     **Transfer Restrictions.**

3.1     **Call Option.**  In the event of a prohibited transfer in violation of any of Section 1 hereof (a "Prohibited Transaction"), the Investors shall have the option to purchase from the pledgee, purchaser, donee or transferee of such stock transferred in violation of any of Section 1, the number of shares that the Investor would have been entitled to purchase had such Prohibited Transaction been effected in accordance with Section 1 hereof, on the following terms and conditions:

(a)     The price per share at which the shares are to be purchased by the Investor shall be equal to the price per share paid to such Key Holder by the third party purchaser or purchasers of such stock that is subject to the Prohibited Transaction; and

(b)     The Key Holder effecting such Prohibited Transaction shall reimburse the investor for any and all fees and expenses, including legal fees and expenses, incurred in effecting such purchase.

3.2     **Put Option.**  In the event that a Key Holder should sell any of his or her stock in contravention of the Co-Sale Right in Section 1.3 (a "Prohibited Transfer"), each Investor, in

addition to such other remedies as may be available at law, in equity or hereunder, shall have the put option provided below, and such Key Holder shall be bound by the applicable provisions of such option.

        (a)     In the event of such Prohibited Transfer, each Investor shall have the right to sell to such Key Holder the type and number of shares of Common Stock equal to the number of shares each Investor would have been entitled to transfer to the purchaser under Section 1.3 had the Prohibited Transfer been effected pursuant to and in compliance with the terms hereof. Such sale shall be made on the following terms and conditions:

        (b)     The price per share at which the shares are to be sold to the Key Holder shall be equal to the price per share paid by the purchaser to such Key Holder in such Prohibited Transfer.

        (c)     Within 90 days after the date on which an Investor received notice of the Prohibited Transfer, such Investor shall, if exercising the option created hereby, deliver to the Key Holder the certificate(s) representing any certificated shares to be sold, each certificate to be properly endorsed for transfer, or a stock power properly endorsed for transfer in the case of any uncertificated shares to be sold.

        (d)     Such Key Holder shall, upon receipt of the certificate(s) or stock power, as applicable, for the shares to be sold by an Investor, pursuant to this Section 3.2, pay the aggregate purchase price therefor and for any and all fees and expenses, including legal fees and expenses, incurred in effecting such purchase.

        3.3     **Legends.**  Each certificate representing, or in the case of uncertificated securities, each notice of issuance with respect to, Key Holders' Shares now or hereafter owned by the Key Holders or issued to any Permitted Transferee pursuant to Section 1.7 shall bear the following legend:

> "THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REFERENCED HEREIN IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN RIGHT OF FIRST REFUSAL AND CO-SALE AGREEMENT BY AND BETWEEN THE HOLDER, THE CORPORATION AND CERTAIN HOLDERS OF COMMON AND PREFERRED STOCK OF THE CORPORATION, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

        3.4     **Required Notices.**  Each Key Holder acknowledges that the Shares are issued and shall be held subject to all the provisions of Section 3.3, the Certificate of Incorporation and the Bylaws of the Company and any amendments thereto, copies of which are on file at the principal office of the Company.  A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement.  Each Key Holder acknowledges that the provisions of Sections 3.3 and 3.4 shall constitute the notices required by Sections 151(f) and 202(a) of the Delaware General Corporation Law and each Key Holder hereby expressly waives the requirement of Section 151(f) of the Delaware General Corporation

Law that it receive the written notice provided for in Sections 151(f) and 202(a) of the Delaware General Corporation Law within a reasonable time after the issuance of the Shares.

4. **Termination.**

    4.1    **Termination Events.**  This Agreement shall terminate and have no further force or effect upon the earliest to occur of any one of the following events (and shall not apply to any transfer by a Key Holder in connection with any such event):

        (a)    the liquidation, dissolution or indefinite cessation of the business operations of the Company;

        (b)    the execution by the Company of a general assignment for the benefit of creditors or the appointment of a receiver or trustee to take possession of the property and assets of the Company;

        (c)    the consummation of a public offering by the Company of shares of its Common Stock pursuant to a registration statement under the Securities Act of 1933, as amended, in connection with which all the then-outstanding shares of Preferred Stock are converted into shares of Common Stock pursuant to the Company's Amended and Restated Certificate of Incorporation as such Amended and Restated Certificate of Incorporation may be amended from time to time; or

        (d)    the consummation of a transaction or series of related transactions deemed to be a liquidation, dissolution or winding up of the Company pursuant to the Company's Certificate of Incorporation.

    4.2    **Removal of Legend.**  At any time after the termination of this Agreement in accordance with Section 4.1, any holder of a stock certificate or notice of issuance legended pursuant to Section 3.3 may surrender such certificate or notice of issuance to the Company for removal of such legend, and the Company will duly reissue a new certificate or notice of issuance without the legend.

5.    **Obligation of Company; Binding Nature of Exercise.**  The Company agrees to cooperate with the parties in their enforcement of the terms of this Agreement, to inform the Key Holders and Investors of any breach hereof (to the extent the Company has knowledge thereof) and to use reasonable efforts to assist the Key Holders and Investors in the exercise of their rights and the performance of their obligations hereunder.  Any exercise of the Right of First Refusal or Co-Sale Right will be binding upon the party so exercising, and may not be withdrawn without the written consent of such Key Holder, except that such exercise may be withdrawn unilaterally by the exercising party if there is any legal prohibition as to a party's consummation of its purchase or sale hereunder.

6.    **Conflicts with Previously Granted Rights of First Refusal.**  In the event of any conflict between the terms and conditions set forth in this Agreement and those set forth in any prior agreement between the Company and a Key Holder granting a right of first refusal to the Company with respect to transfers of Key Holder's Shares, the terms and conditions set forth in this Agreement shall prevail.  If, however, this Agreement shall terminate, the right of first

refusal provisions contained in any prior agreement between the Company and a Key Holder shall be in full force and effect in accordance with its terms.  For clarity, it is expressly intended that the Company's rights of first refusal in prior agreements between the Company and a Key Holder shall continue in full force and effect (or as modified hereby) and shall be exercised or waived prior to the exercise of the Right of First Refusal, the Secondary Refusal Right and the Co-Sale Right hereunder.

7.      **Aggregation of Stock.**  All shares of capital stock of the Company held or acquired by Affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement and such Affiliated persons may apportion such rights as among themselves in any manner they deem appropriate.  As used herein, "<u>Affiliate</u>" means, with respect to any specified Investor, any other Investor who, directly or indirectly, controls, is controlled by or is under common control with such Investor, including, without limitation, any general partner, managing member, officer or director of such Investor, or any private equity or venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, such Investor.

8.      **Additional Parties.**  In the event that the Company enters into an agreement with any officer, director, employee, advisor or consultant to issue shares of Common Stock to such person (whether or not such person is an individual or an entity), following which such person would hold shares of Common Stock constituting 1% or more of the Company's then-outstanding voting stock (treating for this purpose all shares of Common Stock issuable upon the exercise or conversion of exercisable or convertible securities as outstanding), then the Company shall cause such person, as a condition precedent to entering into such agreement, to become a party to this Agreement by executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to the terms of this Agreement as a Key Holder.

9.      **Miscellaneous.**

9.1      **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

9.2      **Entire Agreement.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

9.3      **Amendments and Waivers.**  Any term of this Agreement may be amended or waived only with the written consent of (i) the Company, (ii) the holders of at least a majority of the Key Holders' Shares who are then providing services to the Company as employees, officers, directors or consultants and (iii) the holders of at least a majority of the Company's Series A-1 Preferred Stock, voting as a series, 60% of the Company's Series A-2 Preferred Stock  and Series A-3 Preferred Stock, voting together as a single class on an as-converted basis, and at least majority of the Company's Series B Preferred Stock, voting as a series.  Notwithstanding the

foregoing, this Agreement may not be amended or terminated and the observance of any term hereof may not be waived with respect to any Investor without the written consent of such Investor, unless such amendment, termination, or waiver applies to all Investors in the same fashion.  Notwithstanding the foregoing, this Agreement may be amended with only the written consent of the Company for the sole purpose of including additional purchasers of Series B Preferred Stock as "Investors" or adding a holder of the Company's Common Stock as a "Common Holder" to Schedule 1 pursuant to Section 8.  Any amendment or waiver effected in accordance with this Section 9.3 shall be binding upon the Company, the Key Holders, the Investors, and each of their respective successors and assigns.

9.4    **Successors and Assigns.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.

9.5    **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

9.6    **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

9.7    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

*[Signature Page Follows]*

The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**THE COMPANY:**

AUTOMILE INC.

By:_____

Jens Nylander
Chief Executive Officer

Address:
291 Alma St
Palo Alto, California  94301

The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**INSIGHT VENTURE PARTNERS IX, L.P.**

By: Insight Venture Associates IX, L.P., its
general partner
By: Insight Venture Associates IX, Ltd., its
general partner



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

INVESTOR:

**INSIGHT VENTURE PARTNERS (DELAWARE) IX, L.P.**

By: Insight Venture Associates IX, L.P., its general partner
By: Insight Venture Associates IX, Ltd., its general partner



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**INSIGHT VENTURE PARTNERS (CAYMAN) IX, L.P.**

By: Insight Venture Associates IX, L.P., its general partner
By: Insight Venture Associates IX, Ltd., its general partner

The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**INSIGHT VENTURE PARTNERS IX (CO-INVESTORS), L.P.**

By: Insight Venture Associates IX, L.P., its general partner
By: Insight Venture Associates IX, Ltd., its general partner



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**DAWN CAPITAL II L.P.**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**THE SAASTR FUND I, L.P.**

By: SaaStr Partners I, L.P.
    General Partner



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**SALESFORCE VENTURES LLC**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**POINT NINE CAPITAL FUND III GMBH & CO. KG**



**POINT NINE CO-INVEST III GMBH & CO. KG**

By: _____

Title:   Managing Director of Point Nine Verwaltungs GmbH, Itself acting as General Partner of Point Nine Capital Fund III GmbH & Co. KG

The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**HAMBLE INVESTMENT HOLDINGS LTD**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**NURMI DRIVE AB**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**INVESTOR:**

**TIAGO PAIVA**

The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**FOUNDER:**

**PANTERLO AB**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**FOUNDER:**

**PONTEN SPIRIT HOLDING AB**



       The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**FOUNDER:**

**F3R CONSULTING AB**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**KEY HOLDER:**

**HAFLO AB**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**KEY HOLDER:**



The parties have executed this Amended and Restated Right of First Refusal and Co-Sale Agreement as of the date first written above.

**KEY HOLDER:**

**EHN HOLDING AB**

